IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

THE PLANTATION, LLC                                               APPELLANT

v.                              Case No. 2:12-CV-02088

ARVEST BANK                                                        APPELLEE

JOHN T. LEE, UNITED STATES TRUSTEE                                TRUSTEE

## MEMORANDUM OPINION AND ORDER

Currently before the Court is Appellant The Plantation, LLC's Notice of Appeal (Doc. 1) of

an order of the U.S. Bankruptcy Court for the Western District of Arkansas.  Also before the Court

are Appellant's Brief and supporting documents (Docs. 11-12) and Appellee Arvest Bank's Brief

and supporting documents (Docs. 23-24).

On June 18, 2012, this Court concluded that the February 7, 2012 order of the bankruptcy

court, which concerned a disputed credit claimed by Appellant and denied by Appellee, was final

for purposes of appellate review.  The Court has jurisdiction to hear the appeal of this matter

pursuant to 28 U.S.C. § 158(a)(1) and Fed. R. Bankr. P. 8001(e).

### I. Background

This case stems from the Chapter 11 bankruptcies of Robert and Julia Griffin ("the Griffins").

The Griffins hold a controlling interest in a number of companies that also declared bankruptcy,

including Appellant The Plantation, LLC; Silver Leaf East, LLC; Sabram Estates West, LLC; and

Stinson, Inc.  The legal issue that is the subject of the instant appeal has also been appealed to this

Court by the Griffins (Case No. 2:12-CV-2084); Silver Leaf East, LLC (Case No. 2:12-CV-2085);

Sabram Estates West, LLC (Case No. 2:12-CV-2086); and Stinson, Inc.(Case No. 2:12-CV-2087).

-1-

The procedural posture and background facts for these five appeals, including the instant appeal, are the same.[1]  Therefore, the ruling of this Court with regard to one of these cases will be applicable to all of these cases.  Consequently, in the course of this Memorandum Opinion and Order, the Court will often refer collectively to the five appellants listed above, including Appellant The Plantation, LLC, as "the Debtors," and to the appellee in these appeals, which in all cases is Appellee Arvest Bank, as "Arvest."

The Debtors' bankruptcies impacted financial obligations owed to Arvest.  Arvest was the only secured creditor of the companies owned by the Griffins, and the Griffins personally guaranteed the companies' debts.  The Debtors' five bankruptcy petitions were filed on September 8, 2010.  On October 29, 2010, Arvest filed a motion for relief from the Automatic Stay imposed during bankruptcy proceedings, as set forth in 11 U.S.C. §362(a).  The bankruptcy code's Automatic Stay provision creates a safe harbor for those individuals and entities going through the bankruptcy process by temporarily halting the ability of creditors to collect against the bankrupt estates.  According to §362(a), filing a petition for bankruptcy

> "operates as a stay, applicable to all entities, of –
>
> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
> (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;
>
> (3) any act to obtain possession of property of the estate or of property from the estate

---

[1]  The bankruptcy court grouped all five bankruptcies under the same case caption and addressed orders collectively to the five "debtors-in-possession."

or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title."

*Id.*

On December 14, 2010, the bankruptcy court issued an order on Arvest's motion for relief from the Automatic Stay. (Doc. 9-1). After conducting a telephonic hearing and receiving briefs and evidence from counsel, the bankruptcy court granted Arvest's motion in part by creating certain conditions that the Debtors would be required to adhere to in order to continue to enjoy the protection of the Automatic Stay. Specifically, three of the companies owned by the Griffins – The Plantation, LLC; Sabram Estates West, LLC; and Silver Leaf East, LLC – were now required to make certain monthly "protection" payments to Arvest so that all the Debtors could remain under the umbrella of the Automatic Stay. Unless these monthly protection payments were made, beginning on December 7, 2010, "and on the 7th day of each month thereafter until Debtor[s'] plan of reorganization is confirmed," the Automatic Stay would be removed and collection actions against the bankrupt estates could commence. *Id.* at p. 2. The monthly protection payments were ordered

by the bankruptcy court "'for cause' . . . because Arvest Bank ha[d] been frustrated in its efforts to collect payment of its loan to Debtor[s]." *Id.*

Approximately eight months after the protection payments began, the Debtors and Arvest entered into a settlement agreement with an effective date of August 4, 2011. (Doc. 11-4). While the parties were waiting for bankruptcy court approval of their settlement, the Debtors made the unilateral decision to stop making protection payments to Arvest, reasoning that the need for such payments was obviated by the parties' agreement to the settlement. Arvest disagreed with the Debtors on this point, and on August 16, 2011, Arvest brought a second motion for relief from the Automatic Stay, alleging that Debtors were in violation of the court's previous order for failing to make a protection payment on August 7, 2011. (Doc. 12-2).

From that point onward, the issue of the monthly protection payments became a major source of contention between the parties. The bankruptcy court conducted a hearing on Arvest's second motion for relief from the Automatic Stay on September 7, 2011, and during the hearing, an Arvest officer named William Staed testified before the court. On cross-examination by the Debtors' counsel, and over the objection of Arvest's counsel, Mr. Staed "indicated a willingness" to apply the protection payments made after the settlement was signed by the parties "as a credit to the settlement agreement itself." (Doc. 12-7, p. 27). However, later on in the hearing, Mr. Staed reiterated Arvest's position that it was "entitled to a continuance of the adequate protection payments until this transaction is approved and consummated." *Id.* at p. 51.

At the conclusion of the hearing, the bankruptcy court ruled from the bench that the Debtors must continue to make all monthly protection payments "until this thing gets resolved." *Id.* at p. 69. Mr. Griffin tendered a check that very day to Arvest for August and September 2011's protection

-4-

payments.  *Id.* at p. 73.

Approximately one month later, on October 17, 2011, the bankruptcy court approved the parties' settlement agreement.  (Doc. 12-5).  Unfortunately, court approval of the settlement agreement did not signify the end of the parties' conflicts, particularly with respect to the protection payments.  In an email dated October 13, 2011 (Doc. 24-3, p. 3), just before the settlement was approved by the court, Arvest's counsel stated to the Debtors' counsel, "[s]o long as we get the closing of the settlement done before November 7, 2011, Arvest does not expect future adequate protection payments."  The Debtors' counsel responded by email on the same date that the Debtors did not expect to make protection payments in November or December of 2011.  *Id.* at p. 4.

By October 31, 2011, the parties had not exchanged the documents or cash contemplated in the settlement agreement.  Arvest's counsel, in a letter to Debtors' counsel, reiterated the terms of the settlement agreement and attached to his letter certain relevant documents that required the Griffins' signatures.  (Doc. 12-6).  In the letter, Arvest's counsel averred that "[s]ubject to the Debtors timely paying in full the above weed liens, Arvest will credit the Court Ordered payments made after entering into the Settlement Agreement towards the cash payments . . . I would hope that this is an agreeable compromise since Arvest has been more than reasonable in allowing any credit for the Court Ordered payments.  The amount of the three months of Court Ordered payments [for August, September, and October 2011] totaled $42,406.89."  *Id.*  Counsel closed the letter with a deadline, November 2, 2011, the date by which the Griffins needed to have all documents notarized and delivered to the Arvest branch in Fort Smith.  *Id.*

As of November 3, 2011, the Debtors had still not executed and delivered to Arvest the settlement documents attached to the October 31 letter from Arvest's counsel.  (Doc. 24-3, pp. 23-

24).  Arvest's counsel wrote a letter to the Debtors' counsel on November 3, reminding him that "[t]he documents were to have been signed, notarized where applicable and delivered to Arvest Bank by Wednesday, November 2, 2011.  They were not.  If the documents are not properly executed and delivered by 3:00 p.m. on Monday, November 7, 2011, then Arvest will consider Mr. Griffin in breach of the Settlement Agreement and will prepare, file and prosecute to hearing motions to compel Mr. Griffin and the Debtors performance."  *Id.*

On November 7, 2011, Arvest's counsel sent the Debtors' counsel an email reflecting the fact that the Debtors had still not signed the settlement documents.  Arvest's counsel noted that, as of November 7, Arvest's offer to credit protection payments, including the recently-received protection payment for November 2011, was conditioned on receiving "the deeds, judgments, release and amount for Weed liens . . . no later than Wednesday, November 9, 2011 at noon."  *Id.* at p. 29.

The new deadline for the Debtors' compliance, November 9, 2011, came and went, and Arvest never received the completed settlement documents they requested.  Instead, sometime on November 9, the Debtors' counsel sent Arvest's counsel a lengthy email addressing ten discrete "issues that need to be addressed in the documentation" and proposing "an alternative to trying to work through the issues related to the documentation."  (Doc. 24-4, pp. 1-3).

Even though deadlines for completing the settlement had been by set by Arvest and missed by the Debtors multiple times, it appears that Arvest persisted in offering the Debtors the incentive of crediting the monthly protection payments in order to encourage a quicker resolution of all outstanding matters.  By letter on November 14, 2011, Arvest's counsel again discussed the offer of crediting the protection payments:

"Mr. Staed testified that Arvest was agreeable and willing to give the credits.  The

Debtors have not performed.  As the Court recognized in his ruling, which I have the
audio transcript, Arvest was not required to give credit of the For Cause payments to
the amounts under the Settlement Agreement.  To resolve this matter and delivery of
all documents under the settlement, Arvest will agree to credit all of the For Cause
payments to the first Settlement payment of the $450,000, if and only if on or before
close of business on November 16, 2011: (1) all documents are fully executed and
delivered in form acceptable to Arvest; and (2) the weed liens on the Silver Leaf East
property are paid in full, including any additional interest that may accrue on or
before November 16, 2011."

*Id.* at pp. 11-12.

With a new closing deadline of November 16, 2011, the Debtors made a settlement payment
to Arvest on November 14, 2011.  Arvest observed that the payment was "short the sum of $11,398."
*Id.* at p. 20.  The following day, November 15, the Debtors made a final payment of all cash
contemplated by the settlement agreement, except that the Debtors subtracted the accumulated
protection payments from August 2011 to November 2011 from the total amount tendered to Arvest.
At that point, though the cash component had been paid, the documents required to be signed and
submitted to Arvest under the settlement still had not been released by the Debtors.

In a letter dated November 17, 2011, Arvest's counsel objected to the Debtors having
prematurely assumed a credit for the monthly protection payments "even though the Debtors have
not yet fully performed."  *Id.* at p. 30.  Arvest's counsel then stated, "Arvest reserves the right to
demand payment of the credit amounts if we cannot reach a consensual closing," and proceeded to
itemize the remaining settlement documents that had not yet been completed, including delivery of
certain warranty deeds and judgments.  *Id.*  Arvest set a new deadline of November 18, 2011, for the
Debtors to tender all remaining documents.  In addition, Arvest threatened to file a motion to compel
in the bankruptcy court if the settlement were not completed by November 18.  *Id.* at p. 31.

On November 18, 2011, Arvest's counsel wrote an email to the Debtors' counsel, noting the

Debtors' failure to deliver the required settlement documents, and setting yet another closing deadline of November 22, 2011.  *Id.* at p. 33.  Even though the settlement's terms were still not complete, and Arvest's threat to file a motion to compel was still a possibility, Arvest's counsel stated in the email: "Arvest *has already given* Mr. Griffin a $56,000 credit [representing three months worth of protection payments, from August to November 2011] to the cash payment under the Settlement Agreement and wants all matters resolved for good . . . Thus, the settlement of the fee application without adding more fees and costs to come to Fort Smith and hold a hearing is in everyone's interest."  *Id.* (emphasis added).

Arvest did, in fact, file a motion to compel on November 18, 2011, requesting that the bankruptcy court enforce the settlement agreement.  In the text of the motion, Arvest stated: "Although not required to do so, Arvest *granted* the Debtors credits against the amount of cash due under the settlement for the monthly adequate protection payments made since execution of the Settlement Agreement."  (Doc. 11-10, p. 3) (emphasis added).  But in the next sentence of the motion, Arvest qualified that statement, noting that " the Debtors have refused to deliver the required 'warranty deeds.'" *Id.*  Then, in the following paragraph, Arvest summarized its position as follows: "The Debtors argue that since they made the cash payments, Arvest does not need the consent judgments that are enforceable only if the Griffins do not perform.  However, it is the Griffins' very failure to perform ALL of the terms of the Settlement Agreement that dictates the instant Motion to Compel, and that likewise justifies Arvest's demanding receipt of the consent judgments." *Id.*

On December 7, 2011, Arvest explicitly and, it appears, finally retracted its offer to credit the Debtors' monthly protection payments, this time in open court during a hearing on Arvest's motion to compel.  When given the opportunity to explain its views regarding the protection payment

-8-

credit, Arvest stated: "The debtors were told back in November that if we can't get closed by date certain, those credits are off, we're not bound to do that, there is nothing contractually or under the court order that requires that, and if we can't get closed, those credits are off." (Doc. 24-1, pp. 10-11). Afterwards, the Debtors' counsel responded ". . . this has just blown me away that they're now reneging on the deal about applying the adequate protection payments against the full amount of the money that we paid." *Id.* at p. 29. Arvest's counsel confirmed that no credit would be given, and then demanded: "We want the balance of our adequate protection money. Another [payment] is due today." *Id.* at p. 48.

On December 12, 2011, the bankruptcy court made a telephonic oral ruling granting Arvest's motion to compel. (Doc. 24-6). The court ordered that " . . . the debtors shall have until noon on Friday [December 16, 2011] to have executed and mail or deliver the documents to Arvest's counsel." *Id.* at p. 4. Further, the court chastised the Debtors for their failure to complete the terms of the settlement, finding that " . . . these are things that really should have been executed before now and should not have required Court intervention." *Id.* At the time, the court made no ruling on the claimed credit for monthly protection payments, as that issue had not been pled in Arvest's original motion to compel.

On December 16, 2011, the day of the court-imposed deadline to complete the terms of the settlement, the Debtors delivered all remaining documents to Arvest. (Doc. 24-5, p. 1-2). The Debtors did not pay December's protection payment. On December 19, 2011, Arvest's counsel claimed in a letter to the Debtors' counsel that Arvest had been "shorted" the amount of $70,524.50[2],

---

[2] The Debtors have claimed this amount to be $70,254.90. The Court is without sufficient information to determine which amount is correct. Since the Court is affirming the bankruptcy court's decision to deny the Debtors the credit/refund they request, the specific dollar amount at issue is of no moment here, as the parties will remain in the same financial position they were in prior to appeal.

the sum of five months worth of protection payments, from August to December 2011, and that Arvest refused to credit the Debtors for these payments. (Doc. 11-6). The next day, on December 20, 2011, the Debtors filed a motion to compel Arvest to issue the credit. (Doc. 11-5).

On January 9, 2012, the bankruptcy court held a hearing on the matter of the Debtors' motion to compel. (Doc. 11-7). Shortly thereafter, on January 13, 2012, the court rendered an oral opinion on Debtors' motion, denying the Debtors' request for the credit and stating the court's opinion that Arvest's offer of credit was merely an unenforceable promise to give a gift, which lacked consideration and contractual imprimatur, and thus could not be compelled by the court. (Doc. 11-8). A written order followed on February 7, 2012. (Doc. 11-1). The Debtors filed their Notice of Appeal of the February 7 order on February 17, 2012. (Doc. 11-2).

## II.  Standard of Review

According to Fed. R. Bankr. P. 8013, a U.S. District Court reviewing a U.S. Bankruptcy Court's order on appeal adopts the following standard of review:

> "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses."

The Eighth Circuit has further elaborated that while findings of fact are to be evaluated only for clear error, all legal determinations made by the bankruptcy court are to be reviewed *de novo*. *Wegner v. Grunewaldt*, 821 F.2d 1317, 1320 (8th Cir. 1987). A factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364 (1948)).

-10-

## III. Discussion

The only issue for this Court to resolve on appeal is a matter of basic contract law:  was Arvest contractually obligated to issue a credit to the Debtors, or, in the alternative, did Arvest give the Debtors a completed gift of credit that could no longer be revoked?  As explained more fully below, the Court finds that Arvest and the Debtors did not enter into a contract that required Arvest to credit the Debtors' monthly protection payments against the parties' cash settlement.  The monthly payments were legally owed to Arvest, pursuant to court order, and the Debtors gave no separate consideration that would create a contractual obligation for Arvest to issue a credit.  Instead, Arvest made the Debtors a promise to give a conditional gift of credit, which was unenforceable as long as the conditions attached to the gift remained unsatisfied and the gift were not delivered.  The Court concludes that, in the end, the Debtors never satisfied the gift's conditions, and Arvest never delivered a completed gift.  Accordingly, the bankruptcy court's order denying the Debtors' motion to compel payment of the credit is affirmed, and the Debtors' appeal is denied.

### A.  Arvest Did Not Enter into a Contract to Issue a Credit

The first issue to determine on appeal is whether the parties entered into a valid contract requiring Arvest to issue a credit to the Debtors for several months of court-ordered protection payments.  After reviewing the record and all legal determinations of the bankruptcy court *de novo*, it is clear that the Debtors did not provide consideration in exchange for Arvest's promise to issue the credit.  Without consideration, Arvest was not contractually obligated to issue the credit.

A brief review of the facts surrounding the bankruptcy court's imposition of the protection payments is needed.  Originally, in December of 2010, the bankruptcy court ordered the Debtors to make monthly protection payments because  "Arvest Bank ha[d] been frustrated in its efforts to

-11-

collect payment of its loan to Debtor[s]." (Doc. 9-1, p. 2).  As a consequence, the court ordered the Debtors to pay Arvest a monthly protection payment – a payment separate and apart from any other financial obligation owed by the Debtors to Arvest – "until Debtor[s'] plan of reorganization is confirmed."  *Id.*  Unless the Debtors demonstrated their good faith by paying monthly amounts to Arvest, the bankruptcy court would lift the automatic stay and allow Arvest to pursue collection actions against the bankrupt estates.

Approximately eight months after the protection payments were first ordered and a month after the parties signed a settlement agreement, the bankruptcy court instructed the Debtors to continue making monthly protection payments to Arvest "until this thing gets resolved." (Doc. 12-7, p. 69).  The court's comments on the record at the hearing held on September 7, 2011 show that the court intended the monthly payments 1) to continue, despite the fact that the parties had entered into a settlement agreement the previous month, and 2) to be separate from any financial obligations contemplated by the parties' settlement agreement. *Id.*  After noting that the Debtors had failed to make their monthly payments in August and September of 2011, the court admonished, "[h]ad these adequate protection payments been made as ordered by the Court, we wouldn't be here today.  There was nothing in the agreement that forgave that." *Id.* at p. 69.

Arkansas law states that when a party pays a sum it is legally bound to pay, such payment cannot constitute valid consideration creating a new contractual obligation. *Holmes v. Thompson*, 240 Ark. 818 (Ark. 1966) (citing *Killough v. Payne*, 52 Ark. 174 (Ark. 1889)).  Moreover, when a party to a contract attempts to enter into an additional contract, and no added benefit is received by the obligee except what he was entitled to under the original contract, while the obligor parts with nothing except what he was already bound for, there is no consideration to support the additional

contract. *Feldman v. Fox*, 163 S.W. 766 (Ark. 1914); *Capel v. Allstate Ins. Co.*, 77 S.W.3d 533, 541 (Ark. Ct. App. 2002) ("Additional consideration is required when parties of a contract enter into an additional contract").

Here, the Debtors' court-ordered protection payments were explicitly deemed by the bankruptcy court to be separate from the obligations owed under the settlement agreement. Accordingly, fresh consideration would have been required of the Debtors in order to transform Arvest's promise of credit into a binding contract, as Arvest was legally entitled to receive the protection payments as well certain items agreed to under the settlement, including cash payments and documentation associated with the transfer of property, free of all liens and encumbrances. *See* Doc. 11-4. Since no new consideration was given, no contract existed.

**B. Arvest Was Legally Entitled to Monthly Payments from August to December 2011**

The Debtors' next argument on appeal is that, despite the bankruptcy court's orders to the contrary, Arvest had no legal entitlement to continue receiving monthly payments after the court approved the parties' settlement, "because the Settlement Agreement extinguished everything Debtor owed to Arvest as of the Settlement Agreement Effective Date." (Doc. 10, p. 27).

The Debtors have overlooked the fact that Arvest's legal entitlement to receive monthly payments was a matter entirely in the discretion of the bankruptcy court. It was the bankruptcy court that ordered the payments to commence in the first place, and it was the bankruptcy court's decision as to when such payments could and should cease. The court's December 14, 2010 order, which set forth the terms of the monthly protection payments, explicitly stated that they would continue "until Debtor[s'] plan of reorganization is confirmed." (Doc. 9-1). The order did *not* state that payments would conclude when the parties signed a settlement or when the court approved a settlement.

Furthermore, nothing in the record would lead this Court to conclude that the parties submitted a "plan of reorganization" to the bankruptcy court at any point prior to the filing of the instant appeal.

What is evident from the record is that the first time the Debtors attempted to stop paying monthly protection payments, in August of 2011, the bankruptcy court ordered the payments to continue.  During a hearing on September 7, 2011, a month prior to court approval of the parties' settlement agreement, the bankruptcy court made a ruling that monthly payments were owed for both August and September of 2011 and must continue to be paid until the court deemed the settlement and its attending obligations "resolved." (Doc. 12-7, p. 69).  The following excerpt from the court's September 7 hearing makes quite plain the court's position on the matter:

> " . . . the debtor should be required to continue making payments, most fundamentally, because there's an order of the court that says that.  That's what you're supposed to do.  You just don't – you can't ignore orders of the court without getting permission of the Court to amend them.  You can't assume that it's okay and you worked a deal and therefore the Court doesn't – you're not going to pay any attention to the orders of the court anymore."

*Id.* at pp. 69-70.

When the Debtors filed their motion to compel Arvest to credit them for their August to December 2011 payments, the court reminded the parties that it had ordered the payments to continue past the official settlement date in order to compensate Arvest "for the time value of money Arvest was losing" due to the Debtors' delay in finalizing the settlement.  (Doc. 11-8, p. 6).  The court then imposed a final deadline of December 16, 2011, for the Debtors to deliver all remaining documents and close the settlement, and, in fact, the record reflects that the settlement's terms were not completed until that date.  (Docs. 24-5 and 24-6).  It follows that although the settlement was signed by the parties in August of 2011, and the bankruptcy court approved the settlement in October

of 2011, the settlement was not finally "resolved" until after the December 7, 2011 protection payment was due.  Therefore, by the authority vested in the bankruptcy court and its orders, Arvest was legally entitled to monthly payments from August to December 2011.

### C. Arvest's Promise of a Credit Was a Conditional Gift That Was Never Completed

The Debtors' last point on appeal is that, if the credit were merely a gift not subject to contractual obligations, that gift was completed and remains irrevocable.  Arkansas law provides that in order to make a valid gift, "it must be proven by clear and convincing evidence that (1) the donee was of sound mind; (2) an actual delivery of the property took place; (3) the donor clearly intended to make an immediate, present, and final gift; (4) the donor unconditionally released all future dominion and control over the property; and (5) the donee accepted the gift." *Wright v. Union Nat'l Bank of Arkansas*, 307 Ark. 301, 304 (Ark. 1991) (citing *Phipps v. Wilson*, 251 Ark. 377 (Ark. 1971)).

Of the five requirements for a valid gift listed above, the third requirement of donor intent to make an immediate gift, and the fourth requirement of unconditional release of future dominion and control over the property, are most relevant in deciding the legal issue now before the Court. The parties cannot dispute that Arvest's promise to give a gift of credit persisted in many forms, accompanied by deadlines and other conditions, over the course of several months of contentious negotiations.  The offer of the gift was made and withdrawn repeatedly, due to the Debtors' non-performance of the conditions Arvest attached to the gift.  (Doc. 24-3, pp. 3, 19-20, 23-24, and 29; Doc. 24-4, pp. 11-12, 30 and 33).

In reviewing the bankruptcy court's factual findings regarding the lack of delivery and unconditional release of the gift, the Court believes that no clear error was committed.  The Court

agrees with the bankruptcy court that Arvest's offer of a gift of credit was gratuitous and conditional, and in any event was never a completed gift due to the Debtors' failure to satisfy Arvest's conditions. "It is not enough that a purported donor intend to make a gift, or . . . that the donor take actions that may support the view that he intended for a purported donee to have his property." *Jamison v. Estate of Goodlett*, 56 Ark. App. 71, 81 (Ark. Ct. App. 1997).   What the law requires is that the donor of a gift clearly intend to make an immediate, present final gift *and* unconditionally release all future dominion and control over the property.  *Id.*  The Court finds that neither of these prerequisites occurred in the case at bar, as Arvest consistently placed conditions on the gift and never manifested a clear intent to make an immediate gift without conditions.

The conditions that Arvest placed upon the gift of credit were straightforward, and as stated above, consistent with each written offer of the gift from October through November 2011.  The gift was offered in the first place as an incentive to the Debtors to complete the requirements of the parties' settlement according to Arvest's interpretation of the settlement's terms and according to Arvest's timetable.  *See* Docs. 12-6 and 12-7.  At no point were the Debtors required by the bankruptcy court to comply with Arvest's deadlines and restrictions; the deadlines were established by Arvest for the purpose of completing the settlement in the manner Arvest desired.  The Debtors, for their part, refused to comply with Arvest's conditions on the gift by ignoring Arvest's deadlines, taking issue with the wording of documents, refusing to sign releases, failing to deliver warranty deeds, and questioning whether payments should be made according to the amounts designated by Arvest.  *See, e.g.,* Doc. 24-4, pp. 1-2.

As the giver of the gift, it was in Arvest's discretion to determine whether the conditions it attached to the gift were met, and here, the Debtors steadfastly refused to meet Arvest's conditions,

to the point that court intervention was required in December 2011 to compel the Debtors to deliver the documents needed to complete the settlement. (Doc. 24-6, p. 4). Nevertheless, the Debtors point to two documents generated by Arvest's counsel which they contend prove that Arvest's gift was completed and delivered: first, an email written on November 18, 2011, in which Arvest's counsel stated, "Arvest *has already given* Mr. Griffin a $56,000 credit . . ." (Doc. 24-4, p. 33) (emphasis added); second, a sentence in Arvest's November 18 motion to compel, which noted, "Arvest *granted* the Debtors credits . . ." (Doc. 11-10, p. 3) (emphasis added).

When examining the context of these two statements by Arvest, it is clear that they do not manifest a sudden acquiescence on Arvest's part to remove the conditions it originally placed on the gift. Rather, they appear to be statements intended to encourage the Debtors to fulfill the gift's conditions, and/or remind the Debtors that the promise of the gift had been offered and was potentially still available. Both statements refer to the credit as though it had already been given; however, the inquiry cannot end there. The email from which the first statement was taken and the motion from which the second statement was taken must be read in their entirety in order to determine whether Arvest truly intended to give a completed gift.

Beginning with the November 18 email from Arvest's counsel, it appears that he wrote about the gift as "already given" in one paragraph of the letter; but in a different paragraph, he threatened to file a motion to compel against the Debtors for failing to complete closing documents in a timely fashion. In the context of the email as a whole, the "already given" term functions as an incentive to the Debtors to comply with Arvest's conditions or face the consequence of answering Arvest's motion to compel and appearing before the bankruptcy court. (Doc. 24-4, p. 33). In similar fashion, although it appears that one line of Arvest's November 18 motion to compel refers to the gift of

-17-

credit as "granted," the following line highlights that Arvest was "not required" to give the gift, and the remainder of the motion enumerates the various ways that the Debtors have failed to close on the settlement in a timely manner.  (Doc. 11-10, p. 3).

A review of the voluminous record in this case confirms the Court's view that, both before and after November 18, 2011, Arvest placed conditions on its gift of credit that were never fulfilled by the Debtors.  In arguing that Arvest's gift was actually completed and delivered, the Debtors have simply plucked several words out of two documents written by Arvest's counsel on a single day, hoping that those words can now be used to lock Arvest into a promise to give the Debtors a gratuitous gift.  It is not credible that a gift that was so hotly contested by the parties could be deemed delivered and completed by this evidence alone.  Arkansas law requires that there be a clear manifestation of the immediate, present, and final nature of the gift, and that the gift be unconditionally released by the donor and actually delivered to the donee.  *Wright*, 307 Ark. at 304.  Such a manifestation was not found by the bankruptcy court, and such is not found by this Court.

## IV. Conclusion

After reviewing the parties' briefs, the record, and the bankruptcy court's conclusions of law *de novo*, the Court finds that the determination of the bankruptcy court with respect to the issue on appeal is AFFIRMED.  The Court's findings are as follows: first, Arvest's offer to issue a credit to the Debtors for monthly protection payments, from August 2011 to December 2011, was an unenforceable promise to give a gift, rather than a contract; second, Arvest was legally entitled to monthly protection payments by virtue of the bankruptcy court's order of December 14, 2010, requiring that payments commence, and by the court's later order of September 7, 2011, requiring that payments continue until the court deemed the matter resolved or until the Debtors' plan of

reorganization was confirmed; third, the Debtors failed to prove that the bankruptcy court's findings of fact were clearly erroneous and that Arvest made an immediate, present, final, and unconditional gift of credit.  Accordingly, the judgment of the bankruptcy court is affirmed, and this appeal is DISMISSED.

      IT IS SO ORDERED this 21st day of September, 2012.

/s/ P. K. Holmes, III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE

-19-